In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 20-1471

JENNIFER ARGUIJO,

*Plaintiff-Appellant,*

*v.*

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13-cv-05751 — **Andrea R. Wood**, *Judge.*

_____

ARGUED DECEMBER 8, 2020 — DECIDED MARCH 12, 2021

_____

Before EASTERBROOK, KANNE, and HAMILTON, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* The Violence Against Women Act added to the Immigration and Nationality Act a provision giving "immigrant status" (i.e., permanent residence) to an alien "child" who has suffered domestic violence at the hands of a U.S. citizen:

> An alien who is the child of a citizen of the United States, or who was a child of a United States citizen parent who within the past

> 2 years lost or renounced citizenship status related to an incident
> of domestic violence, and who is a person of good moral charac-
> ter, who is eligible to be classified as an immediate relative un-
> der section 1151(b)(2)(A)(i) of this title, and who resides, or has
> resided in the past, with the citizen parent may file a petition
> with the Attorney General under this subparagraph for classifi-
> cation of the alien (and any child of the alien) under such section
> if the alien demonstrates to the Attorney General that the alien
> has been battered by or has been the subject of extreme cruelty
> perpetrated by the alien's citizen parent. For purposes of this
> clause, residence includes any period of visitation.

8 U.S.C. §1154(a)(1)(A)(iv). Arguijo was born in 1987. Her
mother, like her a citizen of Honduras, married a U.S. citizen
in 1999 and divorced in 2004 because of his violent behavior.
Arguijo had run away the year before, when she was 15, to
escape the abuse. The litigation presents a single issue:
whether, after the divorce, Arguijo remained a "child" of her
mother's ex-husband.

The normal way in which an abused alien child receives
immigrant status under the Violence Against Women Act is
on petition by the non-abusive parent. Arguijo's mother
could have filed such a petition within two years after her
divorce from the abusive man. 8 U.S.C. §1154(a)(1)(A)(iii)(I),
(a)(1)(A)(iii)(II)(aa)(CC). But that two-year window is open
only to the divorced spouse and does not help Arguijo be-
cause her mother died shortly after the divorce. She there-
fore had to petition on her own behalf, and the agency re-
jected her application because a self-petition may be filed on-
ly by someone who "is the child" of an abusive U.S. citizen.
The statute defines the word "child" to include a stepchild
who is under 21 and was under 18 when the marriage oc-
curred. 8 U.S.C. §1101(b)(1)(B). Arguijo meets those timing
rules (she was 11 when her mother married the U.S. citizen

and filed on her own behalf before her 21st birthday), but the agency believes that a stepchild loses that status on the natural parent's divorce from the stepparent. Because, in the agency's view, Arguijo lost stepchild status in 2004, and only a person who "is" a child of an abusive parent may seek relief, the agency denied her application. On review under the Administrative Procedure Act, the district court agreed with the agency. 2020 U.S. Dist. LEXIS 6568 (N.D. Ill. Jan. 15, 2020).

The agency's brief pitches its argument on the word "is". That word could be conclusive if divorce or death necessarily ends a stepparent / stepchild relation, but that's the real issue. The agency assumes an affirmative answer rather than demonstrating that only an ongoing marriage permits someone to call herself a "stepchild." The district court did not make this mistake. Instead the court looked to dictionary definitions. Here is one: a stepchild is the "child of one's spouse by a previous partner." *Black's Law Dictionary* (11th ed. 2019). No spouse, no stepchild, the district court concluded. But we read this definition (and others like it) to record how one *becomes* a stepchild; none of the dictionaries records common usage about how that relation ends. Cf. *Medina-Morales v. Ashcroft*, 371 F.3d 520, 531–32 (9th Cir. 2004) (discussing how a stepchild relation is created while leaving open the question how it ends, if it ever does). Dictionaries do not resolve this litigation.

Both the agency and the district judge saw that their view, coupled with a mother's death, may cut off relief to an abused youngster. Both the agency and the district judge wrote that things are not as bad as they seem, because even after divorce a person remains a stepchild as long as "a family relationship has continued to exist as a matter of fact be-

tween the stepparent and stepchild." This language comes from *Matter of Mowrer*, 17 I&N Dec. 613, 615 (1981). Our reaction is: Huh? If divorce ends a stepparent / stepchild relation, how can a family relationship continue "between the stepparent and stepchild"? That's possible only if divorce does *not* end the stepparent / stepchild relation. And if divorce does not un-make a stepchild relation that arose from a marriage, why should it matter whether a "family relationship" exists?

*Mowrer* created this standard out of whole cloth. It did not cite any provenance for this rule (other than one of the Board's earlier unreasoned decisions) and did not discuss any judicial decision that interpreted the word "stepchild." The Board of Immigration Appeals issued *Mowrer* long before Congress enacted the Violence Against Women Act, and neither the agency nor the district court tried to explain what sense it can make to condition immigration benefits on a stepchild's continuing familial relation *with the abuser*. The point of the option created by §1154(a)(1)(A)(iv) is to allow the abused child to remain in this country without subjecting herself to continued physical or sexual abuse.

By relying on *Mowrer*, however, the agency showed its unease with a rule under which divorce or death automatically ends a victim's status as a stepchild. And there is a better, more textual, reason to be skeptical of the bright line that the agency wants to draw on the date of divorce. Look back to §1154(a)(1)(A)(iv): a child "who resides, *or has resided in the past*, with the citizen parent" (emphasis added) may seek immigrant status. This tells us that the child need not be living with the abusive parent at the time of the application. Maybe it also implies that divorce, which is among the prin-

cipal reasons why a stepchild would stop living with an abuser, does not un-make the stepchild relation.

*Mowrer* treated the meaning of "stepchild" as something that the Board of Immigration Appeals could define in any way it wanted. Immigration officials have considerable lee-way when acting under delegated interpretive authority, see *Scialabba v. Cuellar de Osorio*, 573 U.S. 41 (2014) (one of many immigration cases applying *Chevron* deference), but the part of *Mowrer* that we have discussed is utterly a-textual. It also does not rest on, or implement, any policy unique to immigration law and, as we have observed, predates the Violence Against Women Act. It is not dispositive.

At oral argument the agency told us that a no-contact or-der issued by a state court might serve the same role as the "family relationship" mentioned in *Mowrer*. If both an ongoing family relationship and a legal prohibition of such a relationship add up to stepchild status, language has lost its meaning. The agency added that an immigration judge in a removal proceeding might treat Arguijo as a stepchild, despite the divorce, but that only an immigration judge can do so. At this point the agency was in full flight from both statutory text and common understanding. If an immigration judge can treat Arguijo as a stepchild, why *not* United States Citizen and Immigration Services? One statute should have the one meaning in all of immigration law.

"Stepchild" is hardly a new word, without legal roots. Nor is it new to common usage. Does anyone think that Cinderella stopped being the wicked stepmother's stepchild once Cinderella's natural father died, ending the marriage? She was still a stepchild even after she married Prince Charming and moved to the palace.

So let us ask what "stepchild" means elsewhere in law. For example, a parent must support minor children. That support obligation extends after divorce. Does it extend to stepchildren after divorce? The answer generally is no—not because the meaning of the word "stepchild" precludes it, but because the support obligation usually runs in favor of natural children, and after divorce the stepchild still has a natural parent (two, if both parents from the first marriage are still alive). How about inheritance under a will that provides bequests to children? The common answer is that stepchildren count as children after divorce, unless the will says otherwise.

These and many other examples can be found in Margaret M. Mahoney, *Support and Custody Aspects of the Stepparent-Child Relationship*, 70 Cornell L. Rev. 38 (1984). Mahoney concludes that, "[a]s a general rule … courts and legislatures have not extended stepparent support obligations beyond marriage termination" (*id.* at 52), while "[c]ourts have generally been more willing to regard the stepparent-child relationship as independent of the marriage creating it, and thus capable of surviving marriage termination, in the context of legal issues other than support." *Id.* at 57 (citing state inheritance-tax cases). The difference, Mahoney writes, reflects different reasons why a particular person might receive or be required to pay money, not on some fixed meaning of the word "stepchild."

Consider the Social Security Act. Children are entitled to certain payments based on a parent's earnings. *Florio v. Richardson*, 469 F.2d 803 (7th Cir. 1972), rejects an argument by the Social Security Administration that a stepchild loses "child" status after his or her parent's divorce from the

wage-earner. The court observed that the statute (as in force in 1972) provided benefits to children (including stepchildren) and provided for termination on one of four particular events. That list of four did not include a divorce between the child's natural parent and a stepparent. *Florio* concluded that the word "stepchild" by itself does not do the work of establishing a benefits-termination event.

Much the same can be said about the Violence Against Women Act. An alien child initially qualifies by becoming a stepchild of an abusive U.S. citizen, if that relation is established before the child turns 18 and the application is made before age 21. The statute does not create any "out" clauses except for the age limits—and by referring to a child who "has resided in the past" with an abusive U.S. parent the statute implies that losing a familial relation with the abuser does not cut off the option for an immigration benefit.

Law often uses a word that sounds like it has a temporal extent but doesn't. For example, Title VII of the Civil Rights Act of 1964 provides rights to employees and applicants for employment. Suppose an employee is fired and sues under the statute. By the time of suit, this person is an ex-employee. But in *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997), the Court held that a former employee remains an "employee" under Title VII. Otherwise the function of the statute would be defeated, because if ex-employees are not treated as "employees" an employer could fire someone for an expressly forbidden reason, such as race. By similar reasoning, someone who is a stepchild during a marriage remains one after divorce, when termination of "stepchild" status would defeat application of the substantive rule that abused stepchildren are entitled to an immigration benefit.

The word "stepchild" does not have a single legal meaning, free of the context in which it appears. When legal language has some plasticity, the agency retains interpretive discretion—but, we repeat, *Mowrer* does not interpret the Violence Against Women Act, and the bureau that rejected Arguijo's application did not offer an independent understanding of the word. This leaves us to interpret the word on our own, and we hold that in the context of the Violence Against Women Act "stepchild" status survives divorce.

REVERSED AND REMANDED